seated. You're on this case. Two that 13 0 7 3 6 people in the state of Illinois. He's John Borizov. Are you on behalf of the defendant? Everyone on behalf of turning this Good morning. Hi, Mr McCoy. Are you ready? Thank you. May it please the court. My name is Christopher McCoy from the Office of the State Appellate Defender and I represent Mr Borizov. A prosecutor is not simply an advocate for one party. A prosecutor has a duty to seek justice and not simply to seek convictions. And a prosecutor owes a duty of fairness to every criminal defendant. Here, that duty was not fulfilled as there was a pervasive pattern of prosecutorial misconduct, including improper closing arguments and the introduction of irrelevant and prejudicial evidence. Let me ask you a special question. Looking at your brief, are you challenging the trial court's admission of the evidence or the prosecution's use of the evidence? Well, in Part B of the argument, it's the actual admission of the evidence. In part A, it's the prosecution's use of it through their argument. So both. The five pieces of evidence that we're pointing out, we are challenging the admission of those evidence. You said the prosecution's use of it through the closing argument? Is that what you're... Well, it's a two-part argument. We're arguing that the state's argument was improper for the reasons of... The closing argument. Yes, yes. And then also that these pieces of evidence which we've laid out in our brief should not have been admitted. So then you're talking about trial court error? Yes, yes. Well, are you so much talking about trial court error or are... Could we divide these maybe easier for purposes of the legal argument into preserved and not preserved objections or issues? Well, yes and no. Some of the issues are preserved. Some are not preserved. But they all need to be viewed sort of in the cumulative effect of what happened at trial, both to give context to the preserved errors and as plain error under both prongs of plain error analysis, the fact that Mr. Borzov's fundamental right to a fair trial was infringed on and that the evidence was closely balanced. You're not saying, though, that on an unpreserved base error, as you're going in, it should have been some other vehicle. Our argument is that the state is introducing these improper pieces of evidence, most of which were preserved and that were included in the post-trial motion. So in those cases, then yes, the court should have sustained the defense's objections. All right. So you're challenging the evidentiary ruling, so to speak, of the trial court. Evidentiary rulings are reviewed by this Court under the abuse of discretion standard, correct? Yes. Use of discretion being defined as the trial court's ruling was arbitrary or unreasonable and no reasonable person would agree with the trial court's ruling. That's a fairly significant hurdle, isn't it? Yes, but it's not impossible. And here, much of the evidence we're challenging was simply irrelevant to the real issue at the trial, which was Jacob Nedarcy's credibility. And in fact, the state's entire case rested upon Nedarcy's testimony. Well, if it was irrelevant, how was it prejudicial? Well, the state was basically diverting the jury's attention from the real issue in this case, which is, again, judging whether or not Mr. Nedarcy was credible. So isn't that strategy? Well, in the state... Are they entitled to use a particular strategy? But they still must follow the rules of evidence and must confine their arguments to proper arguments as defined by the case law. So now you're focusing now on the arguments, the closing arguments, not the evidence, not the pieces of evidence and the introduction of it. Well, to answer your question regarding the evidence, their strategy must conform to the rules of evidence in Illinois. And without going one by one, we're arguing that these pieces of evidence were not admissible under the rules of evidence, mostly because of under Rule 401 and 403 being irrelevant or unduly prejudicial. So based on your briefs and your statements here, are you saying, in essence, your position is that this was a closed case, that the state was allowed to portray the defendant as a quote-unquote bad person, and that tipped the scales of justice against them? Is that sort of... And you can totally go to your points, but is that your overarching argument? That's part of it. Another significant factor, too, is that the state was able to misstate the law in closing argument, and that kind of further diverts the jury's attention from what, again, is the real issue in this case, which is... All right, tell us specifically, then, how did they misstate the evidence that prejudiced the defendant in this case? Well, they misstated the law. Or how did they misstate the law? How did they do that? What they... I think the most significant example is that they told the jury it was too late to consider the accomplished witness instruction, IPI 3.17. The prosecutor in his closing argument reasoned that because Mr. Nodarcy had been on the stand for three days, because the jury had seen the videotapes of his prior interrogations, that the jury had already accomplished the goal of 3.17. However, juries are routinely told that they can't make their decisions until they actually begin their deliberations. Obviously, closing arguments occur before deliberations. It actually... I mean, it even occurs before the jury's received their final instruction. So the prosecutor is telling the jurors, it's too late to consider this instruction, which you haven't even heard yet. Did the trial court ever tell... I'm sorry, not the trial court, but did the prosecutor ever say, disregard this particular instruction? No. Let me... What the prosecutor actually said was... And go ahead and analyze what Jake, being Mr. Nodarcy, says. It's too late now. You have already analyzed it beyond belief. You have heard him testify for... You've heard him for three days testifying, and you've seen hours and hours of video. So you've already accomplished that goal. So he's not using the exact words, disregard that instruction, but the import of his argument is, this doesn't matter because of all these other things in this case. Wait a minute. Did the trial judge give the accomplished instruction? Yes, he did. Okay. As I recall, having tried a number of cases, the instructions tell the jury specifically, all of them tell the jury this part of it. The law is contained in these instructions. Arguments, closing arguments are not evidence. The law is contained in these instructions. It is your duty to follow them. He told the jury that, didn't he? That's correct. Wouldn't that supersede and override what the prosecution says? Well, I think this is where we have to kind of take a step back and look at all of the errors that occurred in this case. That this was not the only time that the state is overstepping its bounds, and so that these routine instructions don't cure this pervasive pattern, which we see in this case. And there's certainly case law where the routine instructions have been given, but still the court has held that it was reversible error. And furthermore, the state's attorney, and this also comes from case law, has an air of authority to him. So the jury is going to listen to what the prosecutor says, and that just by virtue of the prosecutor's office has a very significant degree of influence upon the jurors. Over and above the judge, sitting there giving directions to the jury? Well, no, but the jury is hearing this. The jury is hearing, you're going to hear this instruction, but don't consider it. So, you know, again, looking at everything that occurs in this case, the instructions here could not cure all of the errors that affected this trial. From the very beginning, from some of the first words the state says in its opening statement, all the way throughout its rebuttal argument. All right, that's, it's one reading, and the reading that you're taking is that he's saying you don't need to worry about this, although he never said to disregard it. Couldn't another reading of this particular statement, which I also have in front of me, indicate that you have heard this, you have had a chance to listen, you have, you know, and maybe common sense says you've thought about it, and now you're going to go back and get instructions from the court? Isn't that another way to look at this statement? I just, that doesn't comply with the prosecutor's statement that it's too late now. I mean, he's saying at this point, that's all been done. Well, it wouldn't be too late to listen to Mr. Ndarsi because he's not testifying anymore, correct? But he's not, the prosecutor at this point isn't speaking, you know, simply about Mr. Ndarsi's testimony. He's speaking about this particular instruction. And because of that, it's, he is telling the jury that they can basically ignore the instruction, the perhaps most important instruction on the issue of Mr. Ndarsi's credibility, which, as I said, is really what this entire case boils down to. Article 317, as I recall, basically tells the jury you have to view the testifying co-defendant's testimony with suspicion, correct? Yes. The jury is instructed to fill Mr. Ndarsi's testimony with suspicion regarding its credibility. You alluded earlier in your argument that you did not, you felt he was not credible. The case sort of turned on his credibility. Tell us specifically what factors or what parts of the testimony were not credible. Well, you had to, looking at who Mr. Ndarsi is, he's... Well, we know he's the co-defendant, okay? Yes. All right, he testified his role and et cetera, et cetera. But tell us what it was about his testimony that was not credible because that's what you're arguing to us. Yes, he was mentally ill. He was a drug addict. He was a confessed murderer. In fact, he had pled guilty but mentally ill to this murder. At the time of trial, though, he had not been sentenced. So he had an incentive to portray Mr. Borzov in the worst light possible. He was also found... Well, if he's mentally ill, how would he know to do that? Well, this is... At the time of the offense, he is extremely mentally ill. Whether or not that continues to trial, he's hallucinating before, daring, and after the crime. And he... I mean, his testimony is all that really ties the defendant to this offense. But wasn't his mental illness brought out in cross-examination before the jury? Yes, yes. But we're not... I mean, this is not a sufficiency of the evidence challenge that we're making here. We're just saying that if this pervasive pattern of misconduct did not occur, that there's a reasonable probability the jury could have viewed his testimony differently. Did Mr. Nodarcy's story, and we call it that at this point in time, ever change from the time he started and the multiple hour... Started talking to the police and the multiple hours of videotape that he was put through and then his trial testimony? Were there any serious inconsistencies in that testimony? Setting aside, I believe, his very first statement to the police, which was a different story than what he tells here, he is basically telling the same story in each instance. But there's still... When he's arrested, he, as a co-defendant, has the motivation to paint Mr. Borzov as the mastermind behind this entire... There wasn't an argument to the jury? Didn't defense counsel make that argument? Yes, and... The jury was entitled to consider that in reaching its verdict, correct? Yes, but we can't say that that consideration would be the same if all of these improper statements and all of these pieces of inadmissible evidence had not been before the jury. What was the improper statement related to Mr. Nadarcy? Well, the... It's not as much related to Mr. Nadarcy except in terms of IPI 3.17. There's several improper statements. The... For instance, the prosecutor, on multiple occasions, ridicules defense counsel. He calls the defense counsel's argument a slick trick, a distraction, a strategy, and a tactic that the jury shouldn't be fooled by and shouldn't fall for. Did the prosecution ever attack the defense attorney or the strategy and the presentation that the defense attorney conducted? These were attacks on the defense attorney and on his credibility. They are laid out in our brief. And in these improper state... Or improper arguments by the prosecutor, there's references specifically to defense counsel's opening statement, to questioning of witnesses, again, to strategy and tactics, and the fact that he's calling this a trick, that the jury shouldn't be fooled by it, and the fact that the prosecutor routinely uses the pronoun they. And it's important to note that there were three defense counsels at trial. For instance, at one point, the prosecutor asked, how gullible do they think you are? So these are not simply about the... The jury shouldn't be persuaded by... Well, if the jury listened to that whole statement, they would have been laughing afterwards because the prosecution made a significant mistake in that particular... A mistake of how gullible do they think you are? Do they think you're a zero on the gullibility scale? A zero would be you're not gullible. Yes, but... So the jury's sitting there going, what? The import of the argument is still clear, though. I mean, from this statement and from several other statements made by the prosecution, it's an argument that the defense counsel is trying to trick you. The defense counsel is trying to outsmart you. Well, isn't that the same thing as saying it's a red herring? I mean, how... Where do you draw the line between saying something's a red herring and a trick? Well... When we're arguing. The fact is that they... These statements are, again, phrased in terms of what they did. They being the defense counsel. And it's that the defense is trying to, again, fool the jury. And the argument... I guess to answer your question more straightforwardly, the prosecutor's comments are not focused on the evidence. They're focused on what defense counsel did. And I think that's the real difference in this case. And that's what, you know, made the jury think that perhaps they... Made them skeptical of defense counsel as they're trying to fool them. Counsel, does the case law require a defendant's conviction to be reversed every time the prosecution makes an improper argument? No. Admittedly makes an improper argument. And I have some problems with the arguments that were made here, to be candid. But does that require this court to reverse the defendant's conviction every time there's an improper argument? No. No, and... But this is not a case where it's one isolated incident where the prosecutor slightly steps over the line. Here, we've pointed to over 20 improper arguments and five pieces of inadmissible evidence. And even if no one error of those would in itself be sufficient to reverse this case, the cumulative effect of this pattern of misconduct warrants reversal here. Did you intend to talk about the issue of if you follow your oath or were you going to stand on your brief? Yeah, just... You didn't give it... If you did give it a brief... Just briefly, the prosecution obviously does not use the word oath in its argument. But that fact alone doesn't excuse this improper argument as seen in the case of Peoples v. Pete. The prosecution refers to the earlier promise the jury made and tells them that there's only one... If they follow that promise, there's only one possible verdict they can reach and that's guilty. And so even though the word oath isn't used, again, that's a clear import of this argument. And just allowing the prosecution to omit one word and still have an argument be considered proper ignores what is really going on in this case. Unless there are any further questions, we would just ask that this case be remanded for a new trial. You have an opportunity for response. Thank you. Ms. Schwinn? May I please the court, counsel? Good morning. Justice Hutchinson, I think you started it best when you said the problem is that we're looking at defense counsel and defendant wants to look at all these errors together. But there are preserved errors and unpreserved errors. And so therefore, there are different standards. And in terms of the other, you know, the evidence that the defendant is challenging was inadmissible, which again, the people believe was relevant, admissible.  I apologize, Your Honor. I was moving on to their Part B, which is the base term. But you admitted some of the arguments that he's alluding to were, in fact, improper. The closing arguments? Yes. I believe that we did stay on one. In one of the arguments where they discussed the custody mediation issue, that was an argument that was based on evidence that was not ultimately put forward. So you conceded that was error? That's correct. And I believe, Your Honor, if you could give me one moment, I can tell you the page that we did concede it on our brief. We did concede it on page 32 and 33 of our brief. You wanted to start with evidence, and then there are issues of argument. So tell us which way you want to go, and we'll try to stay with you. Your Honor, we'll go with whichever way the court would like to start. But I was mirroring what opposing counsel did, which was? In evidentiary issues, if there is no objection, is the judge responsible to get up and say, ladies and gentlemen, the jury disregard that particular question or disregard that if nobody's asking the judge to do that? No. And in this case, the five issues of evidence that the defendant contests, of those five, three were preserved. The fiance, issues with the search warrant, issues regarding allusions to the street gangs, those were areas that were objected to at trial and argued on in the motion for new trial. There was significant litigation on it. In both of those instances, in all three of those instances, the court made a ruling that it found that it was probative and found that the relevance was not outweighed by the prejudicial effect. In terms of the fiance, Angela testified during the course of this trial, and the state probably knew what she was going to testify to, that she knew Mr. Borisov because they used to ride motorcycles. She and her fiance used to ride motorcycles together. So what was the point of the question, or what was the point of the position that just a few short months after the death of the fiance, Mr. Borisov began to take Angela out? What was the purpose of that? Well, part of it was to show the context, as the court found, was to show the context of the relationship. So the jury knew that they knew each other from Angela's own testimony. Correct. And they knew that they were the riding partner, and they knew that that is how they began dating. It is also to show the speed with which this courtship, engagement, baby, and then ultimate murders of Angela's family occurred. I mean, it's important to, this is a unique case in that it's a case with which there was a speed from the moment they began dating, and they became closer, to the moment that there was a proposal shortly after a pregnancy, a baby, and then shortly after that, murders of Angela's family. What context does that add to the case, assuming that the jury could figure out from common sense the dates that were at issue? Just the relationship as to how they began, why they began. It's just the context of the relationship. And the context meaning, didn't they want to portray him in a negative light? You used context, but I mean, wasn't that the purpose of bringing that up? The context was to show the relationship as to how they began. And as the court found, it certainly portrayed, it could potentially portray both parties in a potentially negative light. And as we set forth in the brief, this is one comment in a extensive trial that was not put forward again in closing arguments or anything of that nature, which, again, only further supports that it's just to show the context of the relationship. It's the context of how they began, and then they quickly moved on from that. So if it were to paint in a bad light, the evidence, or excuse me, the record doesn't support that it was to, as the defendant says, dirty up the defendant at all. There is a context, and that is how it occurred. Counsel, the defense is arguing that the state's case essentially hints on Mr. Ndarsi's credibility. I believe they're saying that Mr. Ndarsi had a motive to cooperate. He was awake in sentencing. There are inherent problems with his testimony. Can you point us to if his testimony was corroborated by other factors besides what he said on the witness stand? Sure. One of the biggest cooperation is the jailhouse tapes between the defendant and Mr. Ndarsi talking. And I believe those are exhibits 51, 52, and 53. In those exhibits, the defendant cryptically asked the defendant, asked Ndarsi, and I will go before, things on, did you wear gloves, cryptically, did you have gloves on out there, cooperation that there was a discussion. They also, there was a point where a defendant discusses some potential arrest that a friend of the cop, that apparently a cop friend of the defendant made at a Hooters, which again, corroborates Ndarsi's testimony that he would tell, that the defendant would tell Ndarsi that there were, he had cops, that he knew cops and he was aware of cops for going away. I think one of the other quite cooperative pieces of evidence is Vincent Schmidt, which is Ndarsi's friend. That friend met with Ndarsi and defendant in November of 2009 at a Dunkin Donuts. At that time, with all three of them present, defendant asked Schmidt whether or not he had some sort of computer background to go into hacking and to look into people's computers. At that time, defendant stated to Schmidt, with Ndarsi present, I could really use someone like you on my crew. I might have to kick you out, Jake. That is an independent person apart from Ndarsi testifying that there is some statements made that would be cooperative of Ndarsi's testimony that he held himself out to being part of this mafia, this sort of mob gang and things of that nature. Were these statements made before Mr. Ndarsi agreed to cooperate with the prosecution? Yes, those were made in the statements to Schmidt. Those were made in November 2009. The murder didn't happen until March. What about the other statements? Were they made before he agreed to testify? The statements in the holding cells, those I'm not, to be honest, I'm not sure of the exact time frame of the date that he agreed to cooperate. It was after Ndarsi had been extradited from Florida to Darien. At that time, I do know that there were two conversations between Ndarsi and the police in Florida, one in which he denied involvement and the second in which he started to tell his testimony in terms of what had transpired and why he was part of the shooting. As we pointed to in the part three of our argument, there's a significant number of cooperation. And a lot of these complained on pieces of evidence are also things of cooperation, the cop phone numbers. Again, that also supports that Ndarsi isn't being incredible or being psychotic. I mean, the crux of the defendant's argument at trial was he fabricated his testimony because he wanted to get himself a better deal. And so he fabricated it beginning in March. Alternatively, or in conjunction, he was psychotic and hallucinating. So the defendant didn't say these things or things of that nature. And these pieces of, particularly the Schmidt testimony, corroborate that he's not fabricating. This is some sort of, this is an issue that these statements that defendant states up to other people are similar to the statements that he made to Ndarsi in the months leading up to these murders. I believe I discussed some other corroborating pieces of evidence. I believe Angela testified at one point, I believe in Halloween 2007, that defendant told her that he needed to be on camera somewhere because he had to, because he had people doing things for him. Again, these are things he told Henry Prucha that don't mess with him because he had connections. These are all statements that are independent of Ndarsi, but corroborate that defendant would have made similar statements, would have made similar statements to Ndarsi and as such. So do you agree or disagree then with opposing counsel that the evidence was closely balanced? I disagree. The evidence is overwhelming. I'm sorry? And why? As I set forth, the evidence is overwhelming. There's corroboration from Ndarsi's testimony. Isn't that one word against another? No, Your Honor. One person's word. There is Ndarsi's word that's corroborated by various other people. His other, as I set forth at the end of our argument three, defendant's reasoning for being at the casino on tape, which is what he told Ndarsi, was, as we argued before the trial court, was not credible. He stated that he was there because they had a history of celebrating birthdays at the casino, yet it was just him and his brother. It wasn't, and it's this history of celebrating with a big family event with cousins and whatnot. It's just him and his brother. It's on a Monday night when the defendant has custody of his son. His father was sick, so they decided not to go. The evidence from the casino showed that if it's a big thing that they've been doing for several years, there's not evidence on a player's card, such as the defendant's or his brother's player's card, that he showed up or that they went to this casino multiple times. Again, those are things in terms of credibility as to what the poking, undercutting the defendant's argument in terms of why Ndarsi should not be credible. And in terms of, yes, Ndarsi said this. The defendant refutes that. But Ndarsi says this with cooperation from a significant number of various different people. And that's not a he said, she said. That's significant, and that's overwhelming. That is why we believe it's not closely balanced. It's an overwhelming case, and that's why even if this court were to find any sort of error, the error is harmless in that it's overwhelming given the significant amount of cooperation of Ndarsi's testimony to support that this is what occurred and to find that the defendant's argument is unsupported by the evidence. How do you respond to defense counsel's argument that the prosecution essentially nullified the accomplished instruction? Well, Your Honor, respectfully, opposing counsel read to you one paragraph that says, do not follow it. He omitted the paragraph immediately before it, which says, all I'm saying is that the accomplished witness instruction makes sense, and you should follow it. But in this case, and you should follow it in this case, too. But look at the facts of the case. The prosecutor is saying, follow the accomplished witness instruction. He's not asking you to. There's no asking you to disregard it. I believe that's just as Hutchinson stated. The paragraph following it points to the fact that there was a significant amount of information in terms of credibility of Ndarsi. And that's something that they were given ample evidence for which to make a decision. So in short, you're saying if you look at the entire argument in context, it did not nullify or attempt to nullify the judge's instruction. That's correct. And the defendant has not raised any issue with jury instruction. And as I believe just as Hutchinson, you pointed out, the jury was properly instructed that these are the instructions that you should follow. And the jury did so as such. Notwithstanding the fact that I said there could be another reading or understanding of this statement, these words are difficult. It's too late now. You've already analyzed it beyond belief. What does that mean? Again, in context, it's referring to the fact that Ndarsi was on the stand for over three days, both in direct and in cross-examination. There's ample evidence for analysis. And given the amount of time he was on, there's a significant amount of evidence for which they can determine whether or not that the statement is not corroborated. How do you respond to opposing counsel's contention and argument that the prosecution made a ridiculed defense counsel and attacked them personally? As we set forth in our brief, it's in the case in whole. The comments were indirectly related to the theory of the case and the persuasiveness and the credibility of the theory of the defendant's case, not defense counsel's, the actual defense counsel in the matter. But the word they was used. That is a pronoun. And it's difficult to understand. I mean, it's difficult to distinguish, to understand what they meant. Looking in total at the context of the argument, there's a significant attack on the defendant's theory of the case, which was the defendant loves Angela, still loves her, and is a good, you know, and so therefore is a good father, wanting to work this out. And Ndarsi should not be trusted because he wanted to fabricate his testimony and his statement in order to get a better deal and to, and or he was psychotic and hallucinating these events. And in response to that, we're saying, we said, look at this evidence. It's difficult to make fabrication when, you know, the fabrication theory is undermined by the fact that you look at the tapes and he's denying it and then says, here you go. You know, then says, okay, well, here, you know, I understand my, you know, my family's safe. I was defendant, you know, maybe believe that these, these people were out to get me. You know, here, here is what occurred. And undermining all of these, undermined all of the defense's theories, all of the defense's theories of the case. And so therefore they're coming, they're merely commenting on the persuasiveness of the argument. I have two questions. First, I'd like you to address the issue of the oath, the discussion of the promise versus the oath. And I will tell you that in reviewing the record, I didn't find what often happened when juries were picked. And all three of us have picked criminal juries before, where defense attorney or the state's attorney will say, now you understand these and you promise you'll listen to all of this. And the defense attorney will say, and you promise you'll listen. Neither attorney said that during the course of jury selection. So what other promise did this jury make that they were referring to? Well, in terms of, in terms of the oath, as we step forward, oath is not mentioned in the closing argument. What's the difference between an oath and a promise? Well, in the cases, in the cases cited by the defendant, the issue is that the prosecution said it's your duty to follow, your oath is your duty to follow this oath, and your duty requires you to find him guilty. Or it's your job, and it's your job, because you took an oath, it's your job to find him guilty. But that wasn't said here. That's correct. And it's significant, because in those cases, they're all implying or outright stating that as part of your role as the jury and the oath you take as a juror, you have to find him guilty. And if you don't do that, you're not living up to your oath. You're not living up to your duty as a juror. That's not what happened here. And what happened here is that it's restating that you did agree that you were going to follow the law, and you did agree. And as we set forth, as the defense counsel said in closing arguments, they did agree that they would deliberate and listen to the evidence. And our response was, well, yeah, and you did agree that you would follow the law. And that's especially important in light of the fact that just before that statement, there was a discussion on being accountable for someone else's actions. And that is important, that that is to follow the law, which is look at the law in terms of when someone is legally accountable for another person's actions, and you need to follow it. And the counsel followed it up by saying, by therefore promising that there is following the law and looking at the facts of the case, we therefore believe that the defendant should be found guilty. To go back to your initial question, Justice Hutchinson, on what's the difference between oath and promise, I think there is an issue depending upon the context in which it was used. Here, the context is not that you have a promise, and we're going to hold you to your promise, and your promise requires you to find the defendant guilty. All right, the other question I have is really overarching. Mr. McCoy's position is that this prosecutorial misconduct was so overreaching in evidence and argument that we have to consider it for purposes of reversal, and because the case was closed. Your position is the case is not closely balanced. Well, if this case is not closely balanced, and if the evidence that's presented during that 2- or 3-week period of time was so overwhelming, why did the prosecution make statements that were careless in some respects, don't worry about it, it's too late, you've already analyzed it, questionable, and potentially reversible. Your promise when no promise was made other than an oath, and then a pretty bad failed sense of humor issue with the gullibility and the law is dumb. Why would the prosecution make those arguments? And these were seasoned prosecutors. Respectfully, it's our position that the comments were not improper, that the comments were proper. Why were they needed if your evidence was so strong as the issue? Why don't you just argue the evidence and stop trying to be clever? Not you personally, but the prosecutors. Your Honor, the comments complained of by the defendant were comments in response to rebuttal, and as we set forth in our brief, a lot of those, or most if not all of those comments, were invited by a response given the argument set forth by the defendant during the closing argument. In terms of closely balanced or not, they are making their argument and they are making it in response to what the defendant argued in his closing argument. Are you saying these were invited comments? It's a whole separate doctrine of the law. Right. Your Honor, when I use the term invited, I was going under the line of cases that say that if a defendant makes some sort of closing argument, the people are entitled, or not entitled, excuse me, can respond to that argument. But that isn't what happened, is it? I'm sorry? Are you trying to hang your head on that doctrine? I feel like invited error? No, we're not. The argument was in terms of, and again, I apologize if it was an imprecise use of the word invited. It was more of defense counsel made these statements during closing argument. And this was proper response in the context of the argument? In the context. That's sort of what you're saying. Yes, and that was though in the cases that I cited and set forth. In terms of closely balanced, that's what we use. And so, therefore, we ask that the court affirm the decision. Thank you, counsel. Thank you. Mr. O'Connor. Justice Hutchinson, to address your earlier question regarding the trial court's sua sponte duty to address these pieces of evidence, our argument isn't focused so much on what the court did wrong, but on that the prosecutor is deliberately and intentionally introducing all these pieces of evidence, and that adds to the pattern of misconduct that we see in this case. For example, Angela's deceased ex-boyfriend and Nicholas's fever, those were not just cases of witnesses sort of going off script or the state not knowing what their witnesses are going to say. These are very deliberate lines of questionings designed to get out these specific pieces of information. Well, why wouldn't that be contextual, trying to set a context for what's happened in this case? I guess the state's position was one of the issues that they were raising is the speed of this relationship, how it formed, how it blossomed, and then how it fell apart, all in a very short period of time. Why wouldn't that be relevant to that issue? Well, the period of time doesn't depend on what her ex-boyfriend died of or whether or not he's alive or not. To give the context that they're talking about, all they needed to say was Angela and Johnny met through a mutual friend. They started dating near the end of 2007. That gives the context of the time. That gives the context of how they met, all of which avoids this prejudicial inference, which the state uses in its opening statement. And again, what we're arguing here is that both the introduction of the evidence and the improper argument are sort of combined, and that's really the problem in this case. The state takes these pieces of inadmissible evidence and uses them to paint Mr. Borzov as a bad person, and particularly as a bad father, all of which leads up to its argument in closing that if Mr. Borzov did not do what the state is claiming he did, then, quote, he is not guilty of anything, and he walks out the door and he can go fight some more for custody of Nicholas. Now, it's true custody was discussed there in trial, but that was custody before these offenses as a possible motivation for these offenses. Here, the prosecutor's comment is not on what happened before trial but on what would happen after trial, particularly if Mr. Borzov was acquitted. But obviously Angela was uninjured. Angela is the mother of this child. Why is this statement a problem? Because the custody battle actually is between the father and mother. It should not go beyond those issues. Well, because the state has pointed out all these reasons why Mr. Borzov is a bad father, and then they're getting the jury to think, well, if we acquit him, then maybe there's some danger to Nicholas. Maybe there's other bad consequences. That's not what the jury should be focused on. They should be focused on the evidence that's presented in trial. And to answer your other question, Judge Hutchinson, to opposing counsel, if the state was so confident in this evidence, why did they repeatedly and intentionally step over the line so many times? And it's because the evidence was not overwhelming. Mr. Nodarcy, his testimony was the only evidence directly implicating Mr. Borzov. The state points to the jail recordings, but, frankly, opposing counsel is assuming too much. Regarding this Richie Curran, who the state says is a police officer, the defendant knows there's no evidence of that. There's nothing in the record to tell us who this Richie Curran is. Well, what about the other corroboration she mentions? Two or three other points she made. No, not in the recordings, but the other. Well, she also mentioned Vincent Schmitz, who basically all that comes from him is that Mr. Borzov said he could be a part of his crew. Now, this one statement from a third party doesn't corroborate all the other somewhat fantastic details that Mr. Nodarcy testifies to. And even if Mr. Borzov made a statement sort of puffing up his chest or trying to seem important, that's not equivalent to solicitating murder. I mean, the actual facts, the actual what he did to make him accountable only comes from the mouth of Jacob Nodarcy, which, as I mentioned before, has many credibility problems. And it is for this reason that all of the errors here and the cumulative effect of everything the state did to step over the line warrants a new trial in this case. Thank you. All right. Thank you, counsel, for your argument. Thank you, ladies and gentlemen, for attending this morning. We would ask that you leave in an orderly fashion. We have another case coming in in about ten minutes, and we need to get to that one. So we will now stand in recess to prepare for that case. Thank you.